GARY M. RESTAINO
United States Attorney
District of Arizona
GLENN B. MCCORMICK
Arizona State Bar No. 013328
Assistant United States Attorney
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
Email: glenn.mccormick@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>              Plaintiff,<br><br>     vs.<br><br>Eric Thomas Scionti,<br><br>           Defendant. | Case No. CR-23-00600-PHX-JJT<br><br>**UNITED STATES' BRIEF ON *DUARTE*'S IMPACT ON DEFENDANT'S PRETRIAL DETENTION** |

The United States, through undersigned counsel, respectfully submits a supplemental brief in support of the arguments the Government made at the Renewed Detention Hearing, set by the Court *sua sponte* on May 20, 2024. (Doc. 40.) Regardless of the Ninth Circuit's issuance of *United States v. Duarte*, No. 22-55048, 2024 WL 2068016 (9th Cir. 2024) (*petition for reh'g en banc filed* on May 14, 2024), the Court should uphold the July 27, 2023, detention order entered in this case (Doc. 19) for the following reasons: First, *Duarte*'s holding is limited to an as-applied constitutional challenge to 18 U.S.C. § 922(g)(1) based on that defendant's felony convictions that lack an analogous criminal violation from the Founding era of the United States. Second, the United States can rebut *Duarte*'s holding as it applies to defendant Eric Thomas Scionti ("Defendant") because Defendant has multiple felony convictions, at least one of which shares distinct similarities with Founding-era laws punishable by death, life imprisonment, or estate forfeiture. Third, the issuance of *Duarte* and its applicability to the pending

§ 922(g)(1) charge against Defendant are outweighed by the other factors in the Bail Reform Act that demonstrate that Defendant is a serious flight risk and a danger to the community.

**PROCEDURAL BACKGROUND**

As background in this case, Defendant faces a single charge of being a Felon in Possession of a Firearm on January 18, 2023, in violation of 18 U.S.C. 922(g)(1) and 924(a)(2). (Docs. 1, 2.) As of that date, Defendant was on probation with Maricopa County Adult Probation (MCAP) when they attempted to go to his residence to arrest him based on probation violations. After the attempted arrest, MCAP officers learned that Defendant had fled the residence. MCAP officers conducted a search of Defendant's residence, under their authority to do so. Later, the FBI—working with the MCAP officers—obtained a federal search warrant for the residence and located the six firearms and ammunition. Defendant was charged in this case via complaint on January 26, 2023, with one count of Felon in Possession. (Doc. 1.) He was indicted for the same offense conduct on April 18, 2023. (Doc. 2). The FBI was unable to find Defendant until July 11, 2023. (Doc. 22.)

Defendant's mother was interviewed in this case and stated, in part, she does not own any firearms, she is aware Defendant is a convicted felon, she was aware he was on probation but had not reported as required, she was aware he had an outstanding warrant for his arrest, she was aware he was prohibited from possessing firearms, she saw defendant in possession of a handgun approximately a year and a half ago, he utilizes the hallway closet just outside his bedroom and everything in the closet belongs to Defendant, and she would not be surprised if the safes in the closet contained firearms.

Defendant has multiple prior felony convictions including the following:

- On September 26, 2007, Defendant was convicted in Superior Court of Arizona, Maricopa County of Criminal Possession of a Forgery Device, a Class 6 Undesignated Offense, and sentenced to two years' probation.
- On September 26, 2007, Defendant was convicted in Superior Court of Arizona,

Maricopa County of Unlawful Discharge of a Firearm, a Class 6 Undesignated Felony, and sentenced to two (2) years' probation.

- On May 17, 2013, Defendant was convicted in Superior Court of Arizona, Maricopa County of Criminal Trespass in the First Degree, a Class 6 Designated Felony, and sentenced to three years' probation. On September 04, 2014, Defendant was sentenced to one year incarceration for violating the terms of probation.

- On September 04, 2014, Defendant was convicted in Superior Court of Arizona, Maricopa County of two counts of Trafficking in Stolen Property, First Degree, both Class 2 Felony offenses. On the first count, he was sentenced to six years' incarceration. On the second count, he was sentenced to six years' probation.

- On September 04, 2014, Defendant was convicted in Superior Court of Arizona, Maricopa County of Possession of Narcotic Drugs, a Class 4 Felony, and sentenced to four years' probation.

- On September 04, 2014, Defendant was convicted in Superior Court of Arizona, Maricopa County of Possession of Narcotic Drugs, a Class 4 Felony, and sentenced to four years' probation.

As part of his most-recent criminal conviction and probation, Defendant acknowledged that he was prohibited from possessing firearms as part of his signed probation conditions from 2014 where he acknowledged, "I will not possess or control any stun guns, tasers, firearms, ammunition, deadly or prohibited weapons as defined in A.R.S. § 13-3101."

After Defendant's arrest in this case, he requested a detention hearing. On July 27, 2023, U.S. Magistrate Judge Alison Bachus ordered Defendant detained pending trial finding Defendant to be a flight risk. (Doc. 19.) The Court rejected Defendant's arguments for release at the time of the hearing and entered the following written findings in the detention order:

- "By a preponderance of the evidence the defendant is a flight risk

and detention of the defendant is required pending trial in this case."

- "There is a serious risk that the defendant will flee; no condition or combination of conditions will reasonably assure the appearance of the defendant as required."

- "I find by a preponderance of the evidence as to risk of flight that: The defendant has a prior criminal history, including at least four felony convictions and five misdemeanor convictions."

- "I find by a preponderance of the evidence as to risk of flight that: The defendant has a serious history of substance abuse, and he tested positive for suboxone in a Pretrial Services urinalysis upon arrest for the instant offense."

- "I find by a preponderance of the evidence as to risk of flight that: The defendant was on probation, parole r supervised release at the time of the alleged offense. He failed to comply with conditions set by Probation for Maricopa County Superior Court in an unrelated criminal matter, and he absconded from supervision by Maricopa County probation in 2021."

(Doc. 19, at 2.) In explaining the reasons for detention, the court did not check the box indicating that it was relying on "the weight of the evidence" in the conclusion that Defendant should be detained. (Doc. 19, at 3.)

On May 9, 2024, the Ninth Circuit issued an opinion in *United States v. Duarte*, No. 22-55048, 2024 WL 2068016 (9th Cir. 2024), (*petition for reh'g en banc filed* on May 14, 2024). On May 14, this Court issued a *sua sponte* order scheduling a Renewed Detention Hearing for May 20, 2024. (Doc. 40.) The Court held the hearing on May 20, 2024, after which it ordered any supplemental briefing by the United States to be filed by the morning of May 22, 2024, and any response from Defendant to be filed by the evening of May 23, 2024. (Doc. 42.)

- 4 -

<u>**ARGUMENT**</u>

**I.     *Duarte*'s Holding is Limited to Finding § 922(g)(1) Unconstitutional As Applied to the Defendant's Convictions in That Case**

On May 9, the Ninth Circuit issued a divided panel decision in *United States v. Duarte*, No. 22-55048, 2024 WL 2068016 (9th Cir. 2024) (*petition for reh'g en banc filed on May 14, 2024*).[1]  In *Duarte*, the court held that 18 U.S.C. § 922(g)(1) violated the Second Amendment *as applied* to the defendant in that case.  *Id.* at \*4, 63.  Importantly, the court did not hold § 922(g)(1) to be facially unconstitutional as to every felon, and in fact noted that the decision was not based "on the notion that felons should not be prohibited from possessing firearms . . . ."  *Id.* at \*63.  Rather, the court limited its holding to finding that § 922(g)(1) "is unconstitutional as applied to [Duarte]."  *Id.*  In doing so, the Court ultimately found that § 922(g)(1) could still be constitutional as to certain felons so long as the Government could meet its burden of proffering Founding-era crimes similar to the defendant's felony that ere punishable by death, life in prison, or estate forfeiture.

The defendant in *Duarte* had been charged with a violation of § 922(g)(1) after police saw him toss a .380 caliber handgun out of the window of a moving car.  The defendant had five prior felony criminal convictions out of the State of California including (1) vandalism, (2) felon in possession of a firearm, (3) possession of a controlled substance, (4) two different convictions for evading a peace officer.  *Id.* at \*4, 6-7.  The defendant was convicted at a jury trial and appealed, challenging the constitutionality of § 922(g)(1).

The *Duarte* majority reviewed the constitutionality of § 922(g)(1) by applying the two-step text-and-history framework for Second Amendment challenges discussed in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S.C. 1 (2022): First, the majority

---

[1] As the United States argued at the Renewed Detention Hearing on May 20, 2024, it preserves its argument that *Duarte* was wrongly decided for the reasons stated in the United States' Petition for Rehearing En Banc in that case.  As the United States referenced at the May 20, 2024, hearing in this case, the Ninth Circuit has ordered an expedited response to the United States Petition in *Duarte*.

determined that the Second Amendment's plain text protected the person (the defendant, who is a felon) and his firearm. *Duarte*, at *4-5, 11-12, 22-33.  Second, because the court found that the plain text of the Second Amendment protected the defendant, the court shifted the burden to the Government to prove that § 922(g)(1) was consistent with the Nation's historical tradition of firearm regulation.  *Duarte*, at *4-5, 11-12, 33-34.

The court recognized that during the Founding era, certain felonies were punished by death, estate forfeiture, or a life sentence, and that "[these] offenses were of a kind the Founding generation thought serious enough to warrant the permanent loss of the offender's Second Amendment right."  *Id.* at 60.  As a result, the court held that, to rebut the presumption that § 922(g)(1) violates a felon's Second Amendment right, the Government can "proffer Founding-era felony analogues that are 'distinctly similar' to [a defendant's] underlying offenses and would have been punishable either with execution, with life in prison, or permanent forfeiture of the offender's estate."  *Id.* at *61.  In reversing Duarte's conviction and holding § 922(g)(1) unconstitutional as applied to him, the court explained that based on the record before it pertaining to defendant's prior convictions, it could not find that "Duarte's predicate offenses were, by Founding era standards, of a nature serious enough to justify permanently depriving him of his fundamental Second Amendment rights."  *Id.* at *63.

## II. Defendant's Felony Conviction for Trafficking in Stolen Property Is Similar to Founding-Era Analogues.

Because the Ninth Circuit's holding in *Duarte* was limited to a finding that § 922(g)(1) was only unconstitutional as applied to that specific defendant's prior felony record, this Court must conduct a searching analysis of Defendant's prior criminal history in this case before overruling the detention order solely based on *Duarte*.

As the Ninth Circuit explained in *Duarte*, the Government can rebut the presumption that § 922(g)(1) is unconstitutional on an as-applied basis by making sufficient comparisons to Founding-era laws.  In explaining the Government's burden, the

*Duarte* majority explained that the Government did not have to identify identical matches between modern felonies and Founding-era felonies.

Instead, the Government can meet its burden by pointing to "these historical regulations as analogies to largely *modern* crimes that may not closely resemble their historical counterparts but still share with them enough relevant similarities to justify permanent disarmament for committing such new-age offenses." *Id.* at *60 (internal quotations, citations, and alterations omitted). As an example of the type of relevant similarities that satisfy the Government's burden, the majority included a parenthetical noting that, "Like burglary or robbery, [modern-day] drug trafficking plainly poses substantial risks of confrontation that can lead to immediate violence." *Id.* at *60 (quoting *Alaniz*, 69 F.4th at 1129-30.

Defendant has multiple prior felony convictions; however, for purposes of the *Duarte* analysis, the Court need only focus on Defendant's 2014 felony convictions for two counts of Trafficking Stolen Property in the First Degree, a Class 2 felony, for which he received six years in prison. *See* Sep. 4, 2014, Sentence/Conviction Record in Maricopa County Superior Court, Case No. CR2014-109871-001, attached hereto as Exhibit A.

Arizona Revised Statutes (A.R.S.) § 13-2307(B) defines First Degree Trafficking in Stolen Property to include any "person who knowingly initiates, organizes, plans, finances, directs, manages or supervises the theft and trafficking of property of another that has been stolen . . . ." Under Arizona law, a person who only "recklessly" traffics in stolen property is guilty of Second Degree Trafficking, a lesser Class 3 felony. Section 13-2301(B)(2) defines "stolen property" as "property that has been the subject of any unlawful taking." Section 13-2301(B)(3) defines "traffic" as "to sell, transfer, distribute, dispense or otherwise dispose of stolen property to another person, or to buy, receive, possess or obtain control of stolen property, with intent to sell, transfer, distribute, dispense or otherwise dispose of to another person." As a result, it is clear that a conviction under A.R.S. § 13-2307(B) such as Defendant's requires (1) some level of managerial or supervisory role, (2)

in a theft and trafficking of the stolen property, (3) knowing that the property is stolen.

Based on the United States' initial review of applicable Founding era laws,[2] there are multiple examples in which Founding era laws punished similar crimes in a way that indicates that "the Founding generation thought [the crimes] serious enough to warrant the permanent loss of the offender's Second Amendment rights." *Duarte*, 2024 WL 2068016, at *60.

The distinction Arizona law makes between First-Degree and Second-Degree Trafficking in Stolen Property is like the distinction made during the Founding era between someone who simply received or possessed stolen property and someone who was more significantly involved in the theft and the trafficking scheme. In the Founding era, State laws punished more drastically an individual who was involved in the theft such that they could be labeled an accessory. In fact, Founding-era laws demonstrated that someone who was prosecuted as an accessory to the theft could be punished similarly to the principal felon committing the theft. *See, e.g.*, 4 William Waller Hening, *The Statutes at Large; Being a Collection of All the Laws of Virginia from the First Session of the Legislature, in the Year 1619*, Ch. IV, Section VI, at Page 272 (1820) (referencing 1730 law), relevant excerpt attached hereto as Exhibit B; 2 Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788), Ch. 37, Section XI, at Page 668 (1886) (referencing 1788 law), relevant excerpt attached hereto as Exhibit C.

As one such example, in the 1748 laws of the State of Virginia, it was clear that an individual who was an accessory to stealing horses could be punished with death, similar to the punishment applicable to the principal felon. 6 William Waller Hening, *The Statutes at Large; Being a Collection of All the Laws of Virginia from the First Session of the*

---

[2] The United States acknowledges the Court's reasoning behind setting an expedited briefing schedule on these issues; however, the United States notes that, pursuant to the Court's expedited briefing schedule, it was given less than 48 hours to conduct a complete historical Founding-era analysis.

*Legislature, in the Year 1619*, Section XIV, Page 130 (1819) (1748 law), relevant excerpt attached hereto as Exhibit D. The Virginia law stated the following:

> And forasmuch as felons are much encouraged to steal horses, because a great number of persons make a trade, to receive and buy of such felons the horses by them feloniously taken, and also do make it their business to conceal such offenders, after the said fact, knowing such felonies to be by them committed; *Be it therefore enacted by the authority aforesaid*, That if any person or persons shall receive, or buy, any horse that shall be feloniously taken, or stolen; or shall harbour or conceal any horse-stealer, knowing him, her, or them to be so, such person or persons shall be taken and received as accessary or accessories to the said felony, and being of either of the said offences legally convicted . . . shall incur and suffer the pain of death, as a felon convict.

*Id.* The Virginia law punished by death any act taken to encourage individuals who steal horses by receiving and buying stolen horses or concealing individuals who engage in theft of horses.

As another example, the 1790 laws adopted by the First Congress punished by death the acts of piracy and robbery on the high seas. *See* An Act for the Punishment of Certain Crimes Against the United States, § 8, 1 Stat. 112, 113 (1790), relevant excerpt attached hereto as Exhibit E. Although the 1790 laws punished the simple receipt of stolen property from a pirate or robber with no more than three years of prison, *id.* § 11, 1 Stat. at 114, the laws included a much more severe penalty for doing anything more than receiving the stolen property. Under the Founding-era Virginia laws, anyone who did significantly more to assist and aid piracy or robbery—such as "aiding, assisting, procuring, commanding, counselling, or advising the same, either upon the land or the sea"—could be adjudged to be an accessary to piracy and, upon conviction, be sentenced to death, *id.* § 10, 1 Stat. at 114.

Although these Founding-era laws—piracy, robbery on the high seas, and horse stealing—are only analogous to Defendant's crimes, it is clear that once a significant theft/robbery crime was committed, any individual who assisted the principal felon in a

substantial way that went above simply receiving the stolen property could be punished in the most severe ways, i.e., death. Given the distinctly similar ways in which the Founding era laws punished accessory to theft and Arizona's laws punish Class 2 Trafficking of Stolen Property, the record is sufficient to find that the Government has met its burden under *Duarte*.

## III. Defendant is a Serious Flight Risk and Danger to the Community.

### A. Legal Standard

A defendant must be detained pending trial when "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). In making an individualized detention determination, a court must consider (1) the nature and circumstances of the offense; (2) the weight of the evidence; (3) the history and characteristics of the person, including character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, and past conduct; and (4) the nature and seriousness of the danger to the community that would be posed by the person's release. 18 U.S.C. § 3142(g); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986). Consideration of non-statutory factors is disfavored. *United States v. Diaz-Hernandez*, 943 F.3d 1196, 1199 (9th Cir. 2019). Detention is appropriate when a defendant is either a danger to the community or a flight risk; it is not necessary to prove both. The Government must establish danger by clear and convincing evidence and must show flight risk by a preponderance of the evidence. *United Sates v. Aitken*, 898 F.2d 104, 107 (9th Cir. 1990).

### B. Defendant Is a Significant Flight Risk.

1. Nature and Seriousness of Defendant's Offense Supports Detention.

Defendant is a significant flight risk and should remain detained on that basis. As noted above, Defendant is a repeat felon with convictions for theft, narcotics possession, trespass, assault, forgery, discharging a firearm, and criminal damage. *See* PSR dated July

13, 2023, Doc. 11, at 3-5. Defendant received six years in prison for Trafficking in Stolen Property in the First Degree, a Class 2 felony offense, on September 14, 2014. *Id.* at 4. Despite serving significant prison time, Defendant possessed several firearms to include high-powered rifles and hundreds of rounds of ammunition. Defendant possessed weaponry while on court supervised probation for three different felony cases (trafficking, narcotics possession, and criminal trespass), and while having active warrants for his arrest for multiple probation violations. Some of Defendant's alleged violations included failing to report, absconding, failing to test and participate in treatment, and drug possession.[3]

Thus, the nature and circumstances of Defendant's offense is extremely serious, demonstrate a lack of respect of law, and weigh in favor of detention.

2. Weight of the Evidence Supports Detention

The weight of the evidence -- which is the least important consideration -- supports detention. On January 18, 2023, MCAP officers attempted to arrest Defendant at his mother's residence for probation violations. Defendant was not present. Defendant's mother identified the bedroom and hallway closet used by Defendant to the probation officers. Defendant's mother stated she did not own any firearms[4] and that she would not

---

[3] This information is taken from the Maricopa County Petition to Revoke filed on December 17, 2021, in CR2014-115238-001, which has been disclosed to Defendant.

[4] At the Renewed Detention Hearing, Defendant proposed his mother could serve as a third-party custodian. Defendant's mother is not an appropriate third-party custodian and the United States objects for the following reasons: first, during the law enforcement search of the residence that led to Defendant's arrest, his mother admitted to knowing of Defendant's drug addiction and identified substances in his room as possible fentanyl; second, despite Defendant's mother admitting to knowing of Defendant's status as a felon and that he was prohibited from possessing firearms, she admitted that she had seen Defendant in possession of a handgun and that she would not be surprised if the safes in the closet used by Defendant contained firearms; third, Defendant's mother admitted to knowing of the active warrant for Defendant's arrest; and fourth, in an April 12, 2023 letter from jail that has been disclosed to Defendant, Defendant directed his mother to sell and keep certain guns in the house.

be surprised if firearms were discovered in the hallway closet used by Defendant. Probation officers located a set of keys inside a suitcase on the bed in Defendant's room. Using the keys, a probation officer unlocked a safe inside the hallway closet used by Defendant and discovered several rifles, handguns, and a large amount of ammunition. Thus, even though the weight of the evidence is generally considered the "least important" factor, *Winsor*, 785 F.2d at 757, the overwhelming evidence supports detention in this case. *See, e.g., United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990) (finding that the weight of the evidence—and defendants' resulting belief they may be convicted as a result—weighed in favor of detention based on flight risk); *United States v. Martinez Lopez*, No. 22-CR-00211-LK, 2023 WL 197293, at *5 (W.D. Wash. Jan. 17, 2023) ("Although the Court makes no determination as to [defendant's] guilt, it acknowledges the strength of the evidence against him and concludes that pretrial release is inappropriate under [this] factor.").

3.    History and Characteristics of Defendant Support Detention

Defendant's history and characteristics strongly suggest he will not abide by court-ordered release conditions and may potentially flee if released. Defendant has been on probation or in prison for committing felonies and misdemeanors since the age of 19. *See* PSR dated July 13, 2023, Doc. 11. Defendant has shown no respect for the law and rules as he repeatedly commits crimes after conviction and while on court supervision. For example, in early 2014, Defendant committed a series of serious property theft crimes, with a co-defendant, resulting in two felony convictions for Trafficking in Stolen Property in the First Degree (CR2014-10987-001). Defendant committed his trafficking offenses while on probation for narcotics felony convictions (CR2014-112-967-001 and CR2014-115238-001) and for criminal trespass CR2013-418657-001). *Id.* at 4.

Defendant was sentenced to six years in prison for his trafficking case and was released on September 4, 2019. *Id.* While in prison, Defendant incurred numerous disciplinary infractions involving possession of contraband, testing positive for an illicit

substance or refusing to test, disruption, obstruction of staff, fighting and other violations. *Id.* at 5.

Defendant's lengthy time in prison did little to deter him as he continued to violate law and probation conditions after release. For example, on December 17, 2021, probation violation warrants were issued for Defendant in his Narcotics case (CR2014-115238-001) and Trafficking case (CR2014-109871.001). On January 20, 2023, Defendant was convicted in Tempe municipal court for two separate assault cases and sentenced to probation (Case Nos. 220221882 and 220206342). *Id.* at 5. On January 27, 2023, another probation violation warrant was issued for Defendant in his narcotics felony case (CR2014-115-238). *Id.* at 4. Significantly, Defendant was on probation and absconder status when he possessed the guns and ammunition charged in this case.

Defendant's lengthy and extensive criminal history strongly suggests he will not abide by any conditions of the Court and flee if released.

Defendant's personal characteristics also suggest he is a serious flight risk. Defendant does not have strong familial ties to the district as he is not married or have children. *Id.* at 2. Defendant does not have stable employment as he allegedly raises and sells pigeons. *Id.* Defendant has mental health issues of anxiety, depression, and post-traumatic stress disorder, and takes medication for his mental health. *Id.* Additionally, Defendant has a long history of narcotics use -- as evidenced by his criminal history -- and admittedly used fentanyl and methamphetamine daily. *Id.* For these reasons, Defendant's personal characteristics likewise supports pre-trial detention.

Finally, Defendant may face significant imprisonment time if convicted as the charged offense has a statutory max of 15 years and his Criminal History Category will likely be a minimum of IV. Given the potential penalty, Defendant has a strong incentive to flee and avoid prosecution. *See Townsend*, 897 F.2d at 995 (9th Cir. 1990) (noting that defendants had a greater incentive to flee when faced with the possibility of lengthy prison sentences); *United States v. Garivay*, No. CR-13-1070-PHX-SRB, 2013 WL 6577320, at

*4 (D. Ariz. Dec. 16, 2013) (considering "a likely significant prison sentence" in detaining defendant); *United States v. Holloway*, No. CR-11-866-PHX-GMS, 2011 WL 4625962, at *3 (D. Ariz. Oct. 6, 2011) (similar).

Based on all the Bail Reform Act factors in 18 U.S.C. § 3142, the Government submits there are no conditions, or combination of conditions, that could reasonably assure Defendant's presence at trial.[5] Detention is therefore appropriate in this case.

### C. Defendant is a Danger to the Community

Defendant will pose a danger to the community if release. As highlighted above, Defendant is a repeat felon who committed the current offense while on probation and absconder status. Defendant has shown no respect for law and his possession of firearms, to include high-powered rifles capable of accepting extending magazines, is concerning and dangerous to the community.

Aside from the charged offense, the government's investigation has revealed that Defendant has likely engaged in the horrific animal crushing of birds in violation of 18 U.S.C. § 48 (Animal Crushing). The Government submits that additional felony charges are forthcoming, and these abusive acts further support a finding that Defendant is a danger to the community.[6]

---

[5] The Government further believes that while an effective tool in some circumstances, GPS monitoring has limited utility in preventing Defendant from fleeing. Supervisees on GPS monitoring are not subject to around-the-clock, real-time monitoring by their supervising officer. Moreover, arrest warrants are not issued the moment a defendant leaves his designated area—rather, that process may take days if a defendant absconds over a weekend. Defendants may use such a delay to leave the Court's jurisdiction. *See, e.g.*, *Townsend*, 897 F.2d at 994-95 ("[W]earing of an electronic device [does not] offer assurance against flight occurring before measures can be taken to prevent a detected departure from the jurisdiction."); *United States v. Rhule*, No. CR-20-0105-JCC-2, 2020 WL 5984072, at *6 (W.D. Wash. Oct. 8, 2020) ("A GPS tracker can be removed, and once it is, [defendant] could flee.").

[6] Prior to the Court's *sua sponte* Renewed Detention Hearing, the undersigned AUSA had previously notified defense counsel that Defendant is under investigation for other federal

## **CONCLUSION**

For the foregoing reasons, the Government asks that Defendant continue to be detained pending trial as a flight risk and a danger to the community.

Respectfully submitted this 21st day of May, 2024.

GARY M. RESTAINO
United States Attorney
District of Arizona

*/s/ Glenn McCormick*
GLENN MCCORMICK
Assistant U.S. Attorney

crimes and that the United States was working towards filing additional charges. The United States expects such charges to be filed promptly and will notify the Court and defense counsel upon the filing of any new charges.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 21, 2024, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Myles Schneider, *Counsel for Defendant*

*/s/ Todd M. Allison*

U.S. Attorney's Office