Myles A. Schneider, #028436
**Myles A. Schneider & Associates, LTD**
14001 N. 7th Street
Suite B104
Phoenix, AZ 85022
Telephone (602) 926-7373
Facsimile (877) 294-4254
Email myles@maschneider.com
**Attorney for Defendant**
**Eric Thomas Scionti**

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>        Plaintiff,<br><br>v.<br><br>Eric Thomas Scionti,<br><br>        Defendant. | Case No:  2:23-cr-00600-JTT<br>               2:24-cr-00890-JTT<br><br>**SENTENCING MEMORANDUM**<br><br>(Defendant in Custody) |

COMES NOW the Defendant, Eric Thomas Scionti, by and through undersigned counsel for Defendant, submits this Sentencing Memorandum to the Court requesting that the Court sentence him to 41.5, with Credit for Time Served, plus three (3) years' supervised release, each to run concurrently with 2:24-cr-00890-JTT, as agreed in his plea agreements with the United States of America.

## INDEX OF EXHIBITS [1]

Exhibit A – MITIGATION EVALUATION – GAVIN R. BAKER PSY.D.

Exhibit B – Character Letters; and

    1.  Robin Scionti, Defendant's Mother;

    2.  John A. Sposato, Defendant's Big Brother volunteer;

    3.  Amber Olson, Defendant's childhood friend;

    4.  Jeffrey Hayes, Defendant's college friend;

    5.  Sarah Takash, Defendant's fiancé;

    6.  James Bostic, Defendant's friend;

---

[1] (Following under Separate Cover)

       7. Steven J. Cihomsky, Teacher, Tempe High School;

       8. Margaret Du Sold, Nurse;

       9. Ruth Allen, next door neighbor;

       10. Sands Saber, Defendant's Grandmother.

Exhibit C – Certificates of Completion.

       1. Criminal Process: The Basics, July 31, 2023;

       2. In the Courtroom, July 31, 2023;

       3. Introduction to Legal Studies, July 31, 2023;

       4. Prison! My 8,344th Day, August, 2023;

       5. Social Studies – U.S. History, November 30, 2023;

       6. Changing Habits around drug and alcohol use, November 30, 2023;

       7. Anger Management, November 30, 2023;

       8. Offender Responsibility, December 2, 2023;

       9. New Inside Issue 11, September 13, 2024;

       10. New Inside Issue 12, September 13, 2024;

       11. Motivation and Inspiration for Incarceration to Recover, February 4, 2024;

       12. Get in the Heard, February 4, 2024;

          a. With Moe and Mary Ellen.

          b. With Brandon Novak.

          c. With Mandie Brando.

          d. With Moses Wright.

          e. With Jodale.

          f. With Tammie Hagen.

          g. With Marshall and Eli.

       13. Motivation and Inspiration for Incarceration to Recover, September 13, 2024;

       14. Get in the Heard, September 13, 2024;

          a. With Moe and Mary Ellen.

          b. Brandon Novak.

          c. With Jodale.

          d. With Marshall and Eli.

          e. With Tammie Hagen.

          f. With Moses Wright.

15. News Inside Issue 11, September 13, 2024;

16. Emergency First Aid, September 13, 2024;

17. Basic First Aid, September 13, 2024; and

18. Transcript of Classes in Total.

## HISTORY AND CHARACTERISTICS OF DEENDANT

Defendant, Eric Scionti, witnessed his father's murder at the age of 5 years old. His father was murdered while conducting a drug transaction from the driver's seat of his vehicle in Phoenix in 1993. (<u>See</u> paragraph 83 at Doc. 26 of PSR in Case 2:23-cr-00600-JJT, herein after "PSR".)  Afterwards, his basic needs were not always met during the months directly following his father's murder, as he often lacked adequate food and clothing. The defendant recounted he and his mother often rummaged through dumpsters for food. His family moved to Richmond, Virginia, a few months after his father's murder to be closer to his maternal grandparents. The Defendant's maternal grandfather died from cancer approximately six months after they arrived. A short time later in 1993, the defendant witnessed a stranger chase down his mother and attempt to forcibly rape her in Richmond. (<u>Id</u>.)

The defendant subsequently returned to Tempe with his mother and sister in 1994. Upon returning to Tempe, in 1995, he witnessed an adult male neighbor sexually abuse his sister by touching his breasts and vagina underneath her clothing. The defendant was physically and verbally abused by his mother from age 5 to 12 or 13. He recalled his mother routinely struck him with a belt until he bled.

The defendant reported he has a history of experiencing hypervigilance, paranoia, vivid nightmares, flashbacks, depressed mood, low energy, lack of motivation, mood swings, irritability, and suicidal thoughts related to a wide-variety of diagnosed mental health conditions including attention-deficit/hyperactivity disorder (ADHD), anxiety, depression, and post-traumatic stress disorder (PTSD). He advised he often isolated himself and used illicit substances to cope with his mental health issues. The defendant estimated he attempted suicide on 20 separate occasions between the ages of 21 and 34. He advised he most often attempted suicide by overdosing with fentanyl. Maricopa County Correctional Health Services records reflect the defendant attempted suicide by drinking cleaning solution while in custody in 2013.  (PSR at ¶ 93.)

As reported by Dr. Baker, Mr. Scionti's life has been defined by adversity and trauma. From an early age he has been haunted by visions of the violent death of his father and grew up

in an abusive environment with few positive and reliable adult figures to counter the overwhelming symptoms from his tragic circumstances. In fact, the only report of such a positive figure throughout his childhood was a Big Brother mentor who took him to the park when he was 5 and 6 years old. At this critical juncture following his father's death, he and his mentor found a pigeon and brought it home in a McDonald's bag. (See Exhibit A at Page 32.)

Defendant served prison time in Arizona. Once released from prison, Mr. Scionti found a baby pigeon outside of a Walmart, which reignited his practice of caring for pigeons from his time in prison. He then developed a pattern of using substantial amounts of drugs at night to self-medicate his symptoms. While intoxicated, he searched the streets for pigeons to collect. These activities appear to have become an obsession and highly perseverative, which is a common symptom of frontal lobe brain damage. He researched and attempted to learn more about caring for pigeons after discovering some pigeons that were wounded or damaged. Eventually, he even learned how to incubate and hatch eggs. He purchased "pigeon magazines" and wanted to build an aviary. He does not appear to have been collecting the birds in order to hurt them initially. These perseverative behaviors escalated over months and years while abusing fentanyl and methamphetamine. At some point, his behavior distorted from rehabilitating naturally injured birds to then harming and torturing them. (Id.)

Mr. Scionti reported feeling considerable guilt and regret for his actions. As a child and as an adult in prison, he was limited in his ability to control his environment and avoid repeated trauma. Caring for pigeons became one of the few ways he could exert agency, and it offered comfort in unsafe environments. Following his TBI and only when severely intoxicated by narcotic drugs, his once therapeutic relationship with pigeons became abusive. The core features of affect dysregulation in C-PTSD are chronic anger/temper outbursts, emotional lability, unexpressed anger, and internalized rage that often are expressed through self-destructive or reckless/risk-taking behaviors. With a severe reduction in impulse control due to frontal lobe brain damage, Mr. Scionti simply unraveled in my opinion and committed severe and heinous acts towards the animals in his care. While his mental illnesses did not prevent him from appreciating the wrongfulness of his actions, his mental health symptoms undoubtedly played a significant role in his decision-making and judgment during the offenses. (Id.)

Dr. Baker recommends a referral to a psychiatric provider with expertise in the treatment of depression, head trauma, overactivation resulting from posttraumatic stress, and ADHD. He may benefit from psychiatric medication to treat his depression, anxiety, and/or PTSD associated

symptoms. Prescribing psychostimulants to treat his cognitive problems is likely problematic given his substance abuse history. Alternatives that treat attention deficits may be explored as clinically indicated. Psychiatric treatment should only be done while Mr. Scionti is also undergoing psychotherapy with an individual therapist, and while he remains sober.

Manifestly, Defendant needs psychotherapy and substance abuse treatment.

## **ARGUMENTS AND AUTHORITIES**

In light of the Supreme Court's decision in *Gall v. United States*, 552 U.S. 38 (2007), it is clear that this Court enjoys enormous discretion in determining the appropriate sentence for Defendant.  For the reasons set forth below, we respectfully submit that, based on the factors set forth in 18 U.S.C. §3553(a), a Sentence of a term of 41.5 Months, followed three (3) years of supervised release.

I.      **Section 3553(a) Factors**

The federal sentencing statute requires that the Court tailor an individualized sentence that is "sufficient, but not greater than necessary" to comply with the purpose of 18 U.S.C. § 3553, and, in "determining the particular sentence to be imposed, shall consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed;

    a. to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    b. to afford adequate deterrence to criminal conduct;

    c. to protect the public from further crimes of the defendant; and

    d. to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a). In this case, a sentence of probation is just and appropriate, for the reasons stated below.

In this case, the general Nature and Circumstances of the offense is not disputed and well represented in the PSR.  The history and characteristics of Defendant are most relevant to this case.  They are outlined above and embodied in the PSR and Dr. Baker's report.

## **NEED FOR THE SENTENCE IMPOSED**

The question before the Court is whether the recommended 66 months is sufficient, but not greater than necessary in light of Defendant's serious mental health problems and drug abuse, which is well documented. Yes, at some point in his life, Defendant must take responsibility for his actions. However, even after his last criminal matter in Maricopa, its probation office did not impose substance abuse treatment until his probation violation in that case. More importantly, Defendant was taken from Towers Jail by US Marshals service into Federal Custody before he had the chance to participate in such treatment, which relapse prevention and aftercare.

Here, a sentence should, reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant; and provide the defendant with needed educational or vocational training. While a sentence needs to be imposed, such a sentence should be tempered by a review of Defendant's mental health and the need to gather a set of tools to combat his compulsions for drugs and to deal with everyday life; and from the looks of it, he never had a real chance to do so.

More importantly and not taken into consideration by the USAPO in its PSR or the USA is the fact that since his incarceration, Defendant has taken more than 30 Self Help Classes while at CCA Florence. (The most the undersigned has ever seen for one Defendant). In other words, Defendant is motivated to educate himself and participate in well needed instruction.

The respective Plea Agreements in this case stipulate the following:
1. In 2:23-cr-00600-JTT, Pursuant to Fed. R. Crim. P. II (c)(l)(C), the parties stipulate that defendant's sentence shall not exceed the middle of the sentencing range as calculated under U.S.S.G. § IB 1.1 (a). This stipulated sentencing cap will not change based on departures considered under U.S.S.G. § IB 1.1 (b); and
2. In 2:24-cr-00890-JTT, Pursuant to Fed. R. Crim. P. II (c)(l)(C), the parties stipulate
3. that defendant's sentence shall not exceed the middle of the sentencing range as calculated under U.S.S.G. § IB 1.1 (a). This stipulated sentencing cap will not change based on departures considered under U.S.S.G. § IB 1.1 (b).

Here, the PSR accurately calculates the Total Offense Level at 17 and Defendant's Criminal History Category at IV, considering the Multiple Count Adjustment. Hence, the guideline range as calculated is 37 to 46 Months for both cases. The most important part of the

sentencing stipulation is that, unless rejected by the Court, the plea agreements' unambiguous language shall not change based upon departures considered. The middle of that guideline range is 41.5 Months of prison.

The Five Departures sought by USA Probation go beyond the guideline range, for what seems to be for subjective reasons and are based upon facts taken into reasons that were already reflected in the calculation of the guideline range on pages 13 through 15 in the PSR. The PSR recommends upward departures based upon the following:

    a. USSG §4A1.3(a)(1): to reflect a criminal history or likelihood to recidivate most closely resembles that of the defendant's. in criminal history, from IV to V; When Criminal History was properly calculated Pursuant to USSG §4A1.1:

    b. USSG §5K2.0(a)(3): to reflect offender characteristic or other circumstance identified in Chapter Five, Part H (Offender Characteristics) or elsewhere in the guidelines as not ordinarily relevant in determining whether a departure is warranted may be relevant to this determination only if such offender characteristic or other circumstance is present to an exceptional degree, of Two Levels; although the PSR also negates this departure by seeking a downward variance pursuant to 18 U.S.C. § 3553(a) factors.

    c. USSG §5K2.2: a two-level upward departure based upon Physical Injury not alleged in this case and although a 4 level increase was correctly calculated pursuant to USSG § 2G3.1(b)(4); and

    d. USSG §5K2.8, a two-level upward departure based upon Extreme Conduct, also taken into consideration by USSG § 2G3.1(b)(4).

The PSR leads off requests for upward variances by stating, [b]ased on a rejection of the plea agreement, the above upward departures are appropriate. While Rule 11 vests district courts with considerable discretion to assess the wisdom of plea bargains, to which attaches a concomitant responsibility to exercise that discretion reasonably, before the Court rejects a plea agreement it must consider individually every sentence bargain presented to them and must set forth, on the record, the court's reasons in light of the specific circumstances of the case for rejecting the bargain. See *In re Morgan*, 506 F.3d 705, 712 (9th Cir. 2007). Here, this series of cases has persisted since Defendant was first arrested on July 11, 2023, 588 days prior to Sentencing. The Plea Agreements in this case were a result of collegiate bargaining between

the Defense and the USA. To reject the plea agreements now is judicially inefficient, leave Defendant without much needed care and prejudices both the prosecution and defense.

## REASONS FOR DOWNWARD DEPARTURE

Diminished Capacity. (A Variance is allowed here as well) A downward departure may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense. Similarly, if a departure is warranted under this policy statement, the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense. See USSG 5K2.13. Here, Dr. Baker's report is replete of information relating to Defendant's diminished capacity and involvement in the above-mentioned case. Hence, a downward departure is supported by his findings.

Mental and Emotional Conditions. (An allowed Variance as well). Chapter Five, Part H of the USSG includes policy statements discussing specific offender characteristics that the Commission has deemed either "may be relevant" or are "not ordinarily relevant" to the determination of whether to depart from the guideline range. If a factor is discouraged under the guidelines, it only can be a basis for departure if present in the case to an "exceptional degree." Mental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines. See USSG 5H1.3; See also above argument.

Variance: *Lack of Youthful guidance*. As stated in the PSR, basic needs were not always met during the months directly following his father's murder, as he often lacked adequate food and clothing. The defendant recounted he and his mother often rummaged through dumpsters for food. While a nurse, Defendant's Mother beat him mercilessly from age 5 to 12 or 13. He recalled his mother routinely struck him with a belt until he bled. One time the kids were very bad at their grandmother's house. Mrs. Scionti would make them get out of the car, seemingly abandoning them on the street as punishment, later to come back and get them. (See Baker Report at page 17.) He watched his father die, his sister and mother sexually assaulted and abused drugs to seek relief because no real therapy was provided as a child. Definitely, a lack of youthful guidance.

As with reasons for upward Departures, there are reasons for downward departures. Intellectually, the only reason for an upward departure here is to make sure Defendant has enough prison time to attend and complete RDAP. If the Court sentences Defendant to 41.5 months, he will be short 2 Months to attend RDAP (including credit for time served). Hence, if any upward departure is considered, The Court should consider sentencing Defendant to 44 months to insure his participation in the BOP's residential treatment program.

## CONCLUSION

Defendant respectfully requests that the Court sentence him to 41.5, with Credit for Time Served, plus three (3) years' supervised release, each to run concurrently with 2:24-cr-00890-JTT.

RESPECTFULLY SUBMITTED this 9th day of February 2025.

MYLES A. SCHNEIDER & ASSOC., LTD.

/s/Myles A. Schneider
MYLES A. SCHNEIDER (AZ Bar No.:028436)
14001 N. 7th Street
Suite B104
Phoenix, AZ 85022
myles@maschneider.com
Telephone: 602-926-7373
Facsimile: 877/294-4254
**Attorney for Defendant**
**Gregory Dean Knutson**

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of February 2025, I electronically transmitted the attached document to the Clerk's Office and transmittal of a Notice of Electronic Filing to the following CM/ECF registrant: Myles Schneider